ACTIVATOR SUPPLY COMPANY, INC., and CULTURE FARMS, INC., *Appellants,* v. JOHN R. WURTH, SECURITIES COMMISSIONER, *Appellee.*

No. 58,136

ACTIVATOR SUPPLY COMPANY, INC., and CULTURE FARMS, INC., *Appellees,* v. JOHN R. WURTH, SECURITIES COMMISSIONER, *Appellant.*

(722 P.2d 1081)

Opinion filed July 18, 1986.

*Robert H. Bretz,* P.C., of Los Angeles, California, argued the cause, and *Craig Anderson,* of Cosgrove, Webb & Oman, of Topeka, *J. Stewart McWilliams* and *Charles E. Kelly III,* of Linde Thomson Fairchild Langworthy Kohn & Van Dyke, P.C., of Overland Park, and *John C. Frieden,* of Frieden & Forbes, of Topeka, were with him on the briefs for appellants in Case No. 58,441.

*Craig A. Stancliffe,* associate general counsel for the securities commissioner, argued the cause and was on the brief for appellee in Case No. 58,441.

*Craig A. Stancliffe,* associate general counsel for the securities commissioner, and special assistant attorney general, argued the cause, and *Robert T. Stephan,* attorney general, *Larry V. Christ,* general counsel for the securities commissioner, and *David D. Plinsky,* assistant attorney general, were with him on the brief for appellant in Case No. 58,136.

*Charles E. Kelly III,* of Linde Thomson Fairchild Langworthy Kohn & Van Dyke, P.C., of Overland Park, argued the cause, and *J. Stewart McWilliams,* of the same firm, was with him on the brief for appellee in Case No. 58,136.

The opinion of the court was delivered by

PRAGER, J.: These are two civil appeals arising from the same district court case in which the trial court upheld an administrative order of the Kansas Securities Commissioner ordering Activator Supply Company, Inc., (ASC) and Culture Farms, Inc., (CFI) to cease and desist certain business operations within and without the State of Kansas. The factual circumstances in the case are somewhat complex. Charles A. Briscoe, the administrative hearing officer, made comprehensive findings of fact which were adopted by both the securities commissioner and the district court on appeal. In order to make the facts more understandable, we will try to simplify the 46 findings of fact of the hearing officer.

It could be stated that the origin of this lawsuit goes back to about 40 B.C. when Cleopatra was the queen of Egypt and

renowned for her beauty. Apparently Cleopatra developed a skill for concocting perfumes and beauty aids. According to the brochure issued by ASC and CFI, Cleopatra enjoyed bathing in milk in order to develop and maintain a soft and supple skin. Cleopatra's secret involved the use of milk cultures which were utilized in the form of bath creams, lotions, and oils. Cleopatra's secret formula was apparently lost and not rediscovered until a lady in Africa, who seemed to grow younger, shared her formula with others. It is stated in the company's brochure that the rest is history.

According to the evidence presented at the trial, a business venture involving the growing of milk cultures was started in South Africa under the name of Kubus Kwerkery pursuant to a licensing agreement with a Liechtenstein corporation. In 1984, the rights in the milk cultures were transferred to Ariate N.V., a Netherlands Antilles corporation, whose agent was Paul Stemm, an Illinois attorney living in California. In 1984, Ariate, through Stemm, transferred its rights in the lactic cultures to Kubus Nursery, a Nevada corporation, for the purpose of marketing the Kubus cultures in the United States. Stemm contacted various persons to set up the marketing program. As a result of Stemm's efforts, several corporations were formed. Activator Supply Company, Inc., (ASC) was organized on November 15, 1984, to engage in the selling and marketing of activator kits which consisted of packets of a dry substance which, when mixed with milk, would form a lactic "culture." Stemm also organized a Kansas corporation, Culture Farms, Inc., (CFI) on November 16, 1984. Its purpose was to produce, buy, and sell cultures. There was also organized a Nevada corporation, Cleopatra's Secret, Inc., (House of Cleopatra) whose function it was to utilize the "cultures" in the manufacture of cosmetics. Various other corporations and organizations were also involved in the business. Simply stated, CFI produced the activators; ASC bought the activators from CFI and resold them to the growers, private individuals who desired to grow the cultures. A minimum of ten activators had to be purchased by a grower for a cost of $350. Activators could be purchased only directly from ASC or its representatives. A person who purchased activators from ASC and grew a "culture" could sell the culture to CFI by use of a form provided by ASC.

Most of the cultures bought by CFI from the growers were made into activators which were then sold to ASC. There were a small number of the cultures purchased from CFI by the House of Cleopatra and utilized in the manufacture of cosmetics. The evidence in the case was undisputed that, at the time of the hearing, there was no other market for cultures except the House of Cleopatra. It is clear from the evidence that only a small percentage of the cultures received by CFI were submitted to the Department of Microbiology at the University of Kansas for testing for quality control evaluation. The vast majority of the cultures, along with their paper containers, were ground up and used to manufacture new activator kits without any testing whatsoever. Further facts about the nature of the business operations will be discussed later in the opinion.

Early in 1985, the business operations of ASC, CFI, and other associated corporations came to the attention of the Kansas Securities Commissioner. A staff attorney for the commissioner ordered an administrative inquiry of CFI pursuant to K.S.A. 1985 Supp. 17-1265. On March 5, 1985, the office of the securities commissioner gave notice by telephone to ASC and CFI that a temporary cease and desist order to halt their business operations was to be issued. The attorneys for CFI wrote the commissioner requesting the statutory notice and a public hearing on the question of what constitutes a security. On March 6, 1985, the securities commissioner issued a temporary cease and desist order pursuant to K.S.A. 17-1265a(b). CFI and ASC then filed an action in district court and a motion seeking a temporary order restraining the cease and desist order on due process grounds in order to prevent irreparable injury to CFI and ASC. The district court issued a temporary restraining order as requested. The commissioner then filed a motion to set aside the temporary restraining order and to dismiss the equitable proceeding. The district court held a hearing and denied the commissioner's motion, holding that ASC and CFI should be afforded a full evidentiary hearing before any temporary cease and desist order became effective. This order was entered on April 2, 1985.

The securities commissioner then entered an order for an evidentiary hearing on April 4, 1985. After a continuance obtained at the request of ASC and CFI, a full evidentiary hearing was conducted by the hearing officer from April 24, 1985, to May

24, 1985. On June 10, 1985, a permanent cease and desist order was issued by the securities commissioner. ASC and CFI appealed to the district court pursuant to K.S.A. 17-1269. The district court afforded the parties a hearing and, on July 1, 1985, filed its memorandum opinion and order upholding the permanent cease and desist order of the commissioner and vacating its prior order restraining enforcement of the commissioner's temporary cease and desist order.

Two appeals followed. In Case No. 58,441, ASC and CFI appealed the judgment of the district court upholding the permanent cease and desist order of the commissioner. In Case No. 58,136, the Kansas Securities Commissioner appealed the district court's issuance of a temporary injunction restraining enforcement of the temporary cease and desist order issued by the commissioner. The two appeals were not consolidated on appeal but were argued together. In view of the fact that the two appeals arose from the same case and are closely interrelated, the Supreme Court has determined that both appeals should be considered in this consolidated opinion.

Case No. 58,441

We shall first consider the appeal in Case No. 58,441, in which ASC and CFI appealed the judgment of the district court affirming and upholding the permanent cease and desist order issued by the Kansas Securities Commissioner. On this appeal, ASC and CFI raise three issues. The primary issue raised on the appeal is one of law and, simply stated, is whether the business operations of ASC and CFI and the contract for sale of activator kits to individual growers constitute the offer and sale of a security under the Kansas Securities Act (K.S.A. 17-1252 *et seq.*).

At the outset, it would be helpful to consider the statutory provisions which govern the registration and sale of securities within the State of Kansas. K.S.A. 17-1254 makes it unlawful for any person to engage in business in this state as a broker/dealer, agent, or investment advisor in the sale of securities unless such person is registered with the Kansas Securities Commissioner. In K.S.A. 1985 Supp. 17-1265, the securities commissioner is given broad powers to make public or private investigations in regard to violations of the act. K.S.A. 17-1266 authorizes the commissioner to bring an action for an injunction or other equitable relief to enjoin acts in violation of the statutes and to

enforce compliance with the act. K.S.A. 17-1266a authorizes the commissioner to issue cease and desist orders for any unlawful act or practice. K.S.A. 17-1266a(b) authorizes the commissioner to issue an emergency cease and desist order where the public interest will be irreparably harmed by delay. K.S.A. 1985 Supp. 17-1267 makes violations of the act a criminal offense. K.S.A. 1985 Supp. 17-1268 provides for certain civil liabilities in the event a person offers or sells a security in violation of the act.

The basic dispute between the parties in this case is whether a contract for the sale of activator kits to a grower constitutes the offer and sale of a security under the Kansas statutes. K.S.A. 17-1252 is the definitions section and defines various terms used in the act, including the term "security." In K.S.A. 17-1252(j), the term "security" is defined to include many different types of contracts and documents including an "investment contract." The parties in this case are in agreement that the contract involved in this case must fall within the category of an "investment contract" in order to be a security under K.S.A. 17-1252(j).

The nature of an investment contract was explored and discussed in depth by Justice Fromme in *State ex rel. Owens v. Colby*, 231 Kan. 498, 646 P.2d 1071 (1982). We have concluded that the principles of law set forth therein are controlling in the case now before us. *Colby* stands for the following legal propositions:

(1) The purpose of the Kansas Securities Act is to place the traffic of promoting and dealing in speculative securities under rigid governmental regulation and control to protect investors, thereby preventing, so far as possible, the sale of fraudulent and worthless speculative securities.

(2) Speculative securities include those, the value of which materially depends upon proposed or promised future promotion or development, rather than on present tangible assets or conditions.

(3) To determine whether a particular financial relationship constitutes an "investment contract" within the meaning of K.S.A. 17-1252(j), the test to be applied is whether the contractual arrangement involves an investment of money in a common enterprise with profits to come from the efforts of others. This test is to be applied in light of the economic realities of the particular contractual arrangement, rather than accepting the terminology employed by the parties in the investment contract.

The opinion in *Colby* discusses the nature of investment contracts at pages 501-04 of the opinion. It reviews the various controlling cases on the issue, including *S. E. C. v. Howey Co.*, 328 U.S. 293, 90 L. Ed. 1244, 66 S. Ct. 1100 (1946), where the United States Supreme Court reviewed a case involving the sale of units of orange groves in Florida. The Supreme Court reviewed the law relating to the definition of "investment contracts" and stated:

"The test is whether the scheme involves an investment of money in a common enterprise with profits to come *solely* from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value." 328 U.S. at 301. (Emphasis supplied.)

The opinion in *Colby* noted the problems that have arisen from the use of the words "solely from the efforts of others" in the *Howey* test. The court recognized that the requirement that the profit in "investment contracts" come *solely* from the efforts of others has been under occasional attack by courts recognizing the economic realities of investments, and this has resulted in modifications of the test in some jurisdictions. The court cited *State v. Hawaii Market Center, Inc.*, 52 Hawaii 642, 485 P.2d 105 (1971), which criticized the use of the "solely" in the *Howey* test and went on to state that the basic economic reality of a security transaction is the subjugation of the investor's money to the risks of an enterprise *over which he exercises no managerial control*. The *Colby* opinion states that the term "security," by common usage, has acquired a much broader meaning than an instrument for the payment of money or to evidence a debt. It is now generally used to refer to instruments for the payment of money, or evidencing title or equity, and which are commonly dealt in for the purpose of financing and investment. *Colby* discusses the prior Kansas case of *State v. Hodge,* 204 Kan. 98, 460 P.2d 596 (1969), which stated:

"Instruments, whether secured or unsecured, which are used for the purpose of financing enterprises and promoting a distribution of rights in or obligations of such enterprises, and which are designed as a means of investment, are now termed 'securities.' " (Syl. ¶ 4.)

The court in *Colby* adopted a test to be applied in determining whether or not a particular financial relationship constitutes an "investment contract." The court stated that the test to be ap-

plied is whether the contractual arrangement involves an investment of money in a common enterprise with the profits to come from the efforts of others. This test is to be applied in light of the economic realities of the particular contractual arrangement, rather than accepting the terminology employed by the parties in the investment contract.

Thus, the *Colby* test requires four essential elements:

(1) An investment of money
(2) A common enterprise
(3) An expectation of future profits
(4) From the efforts of others.

It is necessary that we examine the factual circumstances contained in the findings of fact of the commissioner and the evidentiary record in the case to determine whether or not these four elements are satisfied.

### Investment of Money

ASC and CFI contend that there was no competent evidence demonstrating an investment of money for the purchase of a security. They maintain that the purchase of activator kits did not involve the investment of funds but simply required a payment of money for purchase of a product. The hearing examiner found that a minimum of ten activator kits were sold to each grower at a cost of $350. This finding is supported by the record and is undisputed. In our judgment, the examiner correctly concluded that an investment of money is required to obtain the activator kits. An "investment of money" as the term is used in defining an investment contract for federal security act purposes has been defined to mean only that the investor must commit his assets to the enterprise in such a manner as to subject himself to financial loss. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1978). Likewise, "investment contracts" have been found to exist when the contract involved the purchase or sale of a durable good or animal. *Smith v. Gross*, 604 F.2d 639 (9th Cir. 1979) (purchase and resale of earthworms); *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414 (8th Cir. 1974) (purchase and resale of chinchillas); *Continental Marketing Corp. v. Securities & Exchange Com'n*, 387 F.2d 466 (10th Cir. 1967), *cert. denied* 391 U.S. 905 (1968) (purchase and resale of beavers). We have no hesitancy in holding that the hearing officer, the securities commissioner, and the district court properly found an "investment of money" by the growers in the transaction.

## A Common Enterprise

ASC and CFI contend that there was no common enterprise because they were separate and distinct legal entities and there was no common interest between ASC, CFI, and the individual purchasers of activator kits. The securities commissioner contends that a common enterprise existed because the business success of the growers was linked to the business success of ASC and CFI. This is particulary true because no other market existed for the cultures.

A major case defining "common enterprises" is *Securities & Exch. Com. v. Koscot Inter., Inc.*, 497 F.2d 473 (5th Cir. 1974), which relied on *Securities & Exchange Com'n v. Glenn W. Turner Ent., Inc.*, 474 F.2d 476 (9th Cir. 1973), and held that a pyramid selling scheme involving sales of distributorships satisfied the "common enterprise" element of the definition of an investment contract. The court in *Koscot* defined a common enterprise as one in which the "fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." 497 F.2d at 478. Further, the court stated that the fact that the investor's return is independent of that of other investors in the scheme (sometimes referred to as horizontal commonality) is not decisive. Rather, the requisite commonality is evidenced by the fact that the fortunes of *all* investors are inextricably tied to the efficacy of the promoters. 497 F.2d at 479. This is referred to as vertical commonality. See *S.E.C. v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459 (9th Cir. 1985); *Crowley v. Montgomery Ward & Co., Inc.*, 570 F.2d 875 (10th Cir. 1975); *McCown v. Heidler*, 527 F.2d 204 (10th Cir. 1975).

ASC and CFI maintain that the factual circumstances in this case are different from the other cases because the sale of activator kits and the repurchase of cultures is not accomplished through the same company but through two separate legal entities. The securities commissioner and district court held that fact did not preclude the finding of a common enterprise. In this case, the two companies are closely associated and create both the supply and demand. The House of Cleopatra was the only market for the cultures. ASC was the only supplier of the activator kits, the culture starters, and CFI was the only purchaser of

the cultures from the growers. Clearly the fortunes of the growers were interwoven with and dependent upon the efforts and success of the circular process by which the activator kits were sold by ASC to the growers, the cultures were sold by the growers to CFI, and those cultures were then sold by CFI in activator kits to ASC.

In cases in which one company sells and then repurchases a product or animal, other courts have had little problem finding a common enterprise between the investor and the promoter. *Smith v. Gross*, 604 F.2d 639; *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414; *Continental Marketing Corp. v. Securities & Exchange Com'n*, 387 F.2d 466. To allow two closely connected companies to do indirectly what one company could not do directly would circumvent the purpose of a securities act designed to protect the public from speculative or fraudulent schemes of promoters.

In this case, various findings of fact of the hearing examiner, supported by the evidence, established a close relationship between the principal officers and representatives of the various companies. For example, the articles of incorporation of Culture Farms, Inc., filed on November 16, 1984, and the articles of incorporation of ASC filed on November 15, 1984, named Allen W. Curtis as the director. It is undisputed that attorney Stemm created CFI, ASC, and the House of Cleopatra for the express purpose of promoting Ariate's interest in the cultures. Likewise, CFI buys cultures only from customers of ASC.

It was undisputed that ASC conducted sales meetings to explain the close association among ASC, CFI, and the House of Cleopatra. The hearing officer found, and the evidence was undisputed, that three individuals—Taylor, Nocera, and Mancuso—actively participated in the initial organization and management of ASC and CFI. Mancuso held himself out as an officer of both CFI and ASC. The hearing officer found that the activities of those three individuals coupled with those of Stemm indicated a concerted effort to conduct the joint venture composed of the growers, CFI, ASC, and the House of Cleopatra. In our judgment, the findings of the hearing officer, adopted by the securities commissioner and the district court, that there was a common enterprise are supported by the law and the evidence in the record.

## An Expectation of Future Profits

The hearing officer found that ASC created a brochure to be circulated among prospective growers which advertised that persons who participate in the culture growing project could expect to make a profit for their endeavors. The brochure states unequivocally that for an initial purchase of ten lactic "activators" at a cost of $350, a culture grower can expect to receive a total income of $900. The brochure distributed by CFI states that it, "Proudly presents from Milk to Profit with Lactic Cultures." The obvious purpose of the entire operation which appeals to the growers is that for an investment of $350 they have the "Opportunity of a Lifetime" to obtain extra income.

ASC and CFI contend the brochures reviewed by the securities commissioner at the time the temporary cease and desist order was entered were obsolete and different from the current ASC and CFI brochures and order forms. They argue that these modifications changed the economic and legal realities. We have no hesitancy in holding that a purchaser of activator kits had high expectations of profit. Otherwise there was no reason to purchase them.

## From the Efforts of Others

The *Colby* test for an investment contract requires a contractual arrangement which involves an investment with profits to come *from the efforts of others*. We agree with the court in *Securities & Exchange Com'n v. Glenn W. Turner Ent., Inc.*, 474 F.2d 476, that the test to be applied is whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise. To hold otherwise would make it easy to evade the existence of an investment contract by adding a requirement in the contract that the buyer contribute a modicum of effort. The *Turner* test was applied in *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414.

In the present case, although the investors/growers had to contribute some effort in growing the cultures, nevertheless, the growers could not receive the expected profit represented by ASC in its brochure unless the promoters repurchased the harvest, because there was no other market for the cultures. Clearly ASC and CFI had to get additional investors in order to pay the growers for their cultures. The efforts of ASC and CFI were the

undeniably significant ones which affected the success or failure of the enterprise. We have no hesitancy in holding that any profits from the enterprise had to come "from the efforts of others," that is, the officers and managers of ASC and CFI. We hold that the hearing officer, the securities commissioner, and the district court were correct in holding that all the elements of an investment contract were present and that the contract with a grower in this case was an investment contract and, therefore, a security under the Kansas statutes.

In the appeal in Case No. 58,441, CFI and ASC also contend that the securities commissioner did not have jurisdiction to issue a permanent cease and desist order because a hearing was not held within 15 days after the companies requested a hearing as provided for in K.S.A. 17-1266a(b) and K.A.R. 81-11-2(b), which state as follows:

"17-1266a. Cease and desist orders; temporary orders; hearings; notice. (a) If the commissioner determines *after notice and opportunity for a hearing* that any person has engaged, or is engaging, or is about to engage in any act or practice constituting a violation of any provision of this act or any rule or order hereunder, the commissioner by order may require that such person cease and desist from the unlawful act or practice and take such affirmative action as in the judgment of the commissioner will carry out the purposes of this act.

"(b) If the commissioner makes written findings of fact that the public interest will be irreparably harmed by delay in issuing an order under subsection (a) of this section, the commissioner may issue a temporary cease and desist order. Prior to issuing a temporary cease and desist order, the commissioner whenever possible, by telephone or otherwise, shall give notice to the person of the proposal to issue a temporary cease and desist order. Upon the entry of a temporary cease and desist order the commissioner shall promptly notify in writing the person subject to the order that such order has been entered, the reasons therefor, and that within fifteen (15) days after the receipt of a written request from such person the matter will be set down for hearing to determine whether the order becomes permanent and final. If no hearing is requested and none is ordered by the commissioner, the order will remain in effect until it is modified or vacated by the commissioner. If a hearing is requested or ordered, the commissioner, after notice of and opportunity for hearing to the person subject to the order, shall by written findings of fact and conclusions of law, vacate, modify, or make permanent the order.

"(c) No order under this section, except an order issued pursuant to subsection (b), may be entered without prior notice of an opportunity for hearing. The commissioner may vacate or modify an order under this section if he or she finds that the conditions which prompted its entry have changed and that it is in the public interest to do so." (Emphasis supplied.)

K.A.R. 81-11-2(b) provides:

"(b) Any person who receives a notice under subsection (a), or who is issued a temporary cease and desist order or a summary order that suspends the effectiveness of a registration or the use of an exemption, may file a written request for a hearing with the commissioner within 10 days of receiving this notice. If a hearing is requested, the commissioner shall hold a hearing not less than five days nor more than 15 days after receiving the request."

When this issue was raised in district court, the court held that the jurisdictional challenge was without merit, reasoning as follows:

"2. Notice of Hearing. The Court, in its Order on Motion to Set Aside Temporary Restraining Order, entered April 2, 1985, held that the threat of irreparable harm to petitioners required a hearing be held before the Commissioner should be permitted to enjoin petitioners. We concluded then that the Court's restraining order should continue in effect until a hearing was held under K.S.A. 17-1266a(a) as the action taken under 1266a(b) had been enjoined.

"The Commissioner entered an Order for Hearing on April 4, 1985 setting April 12, 1985 as the hearing date. The Commissioner acted under K.S.A. 17-1266a(b) on petitioners' March 18, 1985 request for hearing. In this regard we conclude:

"(a) That the requirement of K.S.A. 17-1266a(b) that a party be afforded a hearing within 15 days from the date of request contemplates a cease and desist order being in place. Here the Court had temporarily restrained the enforcement of the cease and desist order during this period at petitioners' request. This Court order was in effect until after the hearing was concluded.

"(b) A hearing was given within 15 days of the Court's April 2, 1985 decision. The Commissioner acted with reasonable dispatch in affording petitioners a hearing.

"(c) Whether the Commissioner proceeded to hold a hearing under 1266a(b) or 1266a(a), as directed by the Court, is not significant so long as the hearing was held within a reasonable time under the circumstances, substantially complied with the statute and afforded due process. The distinction made in these subsections lacks a significant difference in terms of due process.

"(d) Petitioners have shown no prejudice suffered due to not scheduling the hearing at an earlier date. The hearing was continued from April 12 to April 24 at petitioners' request.

"(e) Petitioners had ample opportunity to meet the Commissioner's claims set forth in his March 7, 1985 Temporary Cease and Desist Order."

We agree with the trial court that the provisions of K.S.A. 17-1266a(b), which require that, upon entry of an ex parte cease and desist order, the commissioner shall enter an order and the reason therefor, and that within 15 days after a written request by such person the matter will be set down for hearing to determine whether the order becomes final, have no application in a situation where a district court has issued a temporary order restraining the securities commissioner from issuing or enforcing a

temporary cease and desist order. If there is no temporary cease and desist order in operation, there is no occasion to apply the 15-day provision and it does not restrict the authority of the securities commissioner to conduct an evidentiary hearing under K.S.A. 17-1266a(a) on the question of whether a *permanent* cease and desist order should be issued. Under these circumstances, the trial court was correct in holding that the securities commissioner had jurisdiction to issue his permanent cease and desist order after a full evidentiary hearing was provided the respondents, ASC and CFI.

As their next point on appeal, ASC and CFI contend that they were denied due process rights at the administrative hearing before the hearing officer. They objected to fourteen separate rulings of the hearing officer involving evidentiary matters, in refusing to compel testimony from certain witnesses, in refusing to grant immunity to certain witnesses, in admitting certain testimony from an investigator of the companies in the State of Florida, and in admitting a transcript of a hearing conducted in Las Vegas, Nevada, in regard to the business activities of ASC. The district court addressed each of these issues and concluded that the petitioners were not denied due process at the administrative hearing. We agree with the district court. Any rulings by the hearing officer could not have prejudiced the rights of ASC and CFI. The manner of operation of the business involving the sale and repurchase of activator kits and the inter-involvement of various officers and agents of the companies were virtually undisputed. In fact, the evidence relied upon by the hearing officer came almost exclusively from admissions and statements made by the principal officers of ASC and CFI. The issue presented in the administrative proceeding was essentially a question of law—whether the contract for the purchase of activator kits constituted the offer and sale of a security under Kansas law. This legal issue has been discussed heretofore and determined adversely to ASC and CFI. We hold that the district court was correct in finding that ASC and CFI were not denied any due process rights in the administrative proceeding.

In their reply brief, ASC and CFI raise a fourth issue which was never raised in the district court nor in their original brief. The companies attack the permanent cease and desist order as overly broad on the basis that it attempts to control the business

operations of ASC and CFI outside the boundaries of Kansas. In the commissioner's permanent cease and desist order, ASC and CFI are ordered to immediately cease and desist from any acts in Kansas or elsewhere *in furtherance of acts in Kansas* or elsewhere in furtherance of any acts, when acts in furtherance thereof are being committed in Kansas. The order recites that it does not prohibit any purchase of "cultures" from investors not in violation of the securities act. The order does not prohibit any sale of cultures to cosmetic manufacturers or to any other persons who will use them for any purpose other than in furtherance of violations of the securities act as described in the order. ASC and CFI contend that the language used is an attempt by the securities commissioner to extend the state's exercise of its powers beyond its boundaries in violation of the due process and commerce clauses of the Fourteenth Amendment. We cannot say that the permanent cease and desist order was overly broad inasmuch as the permanent order is restricted in its application to acts in Kansas or acts outside of the state which are directly in furtherance of acts in Kansas and which are in violation of the Kansas Securities Act.

## Case No. 58,136

In Case No. 58,136, the Kansas Securities Commissioner appealed the order of the district court refusing to set aside its ex parte temporary restraining order restraining the securities commissioner from enforcing his temporary cease and desist order. The temporary cease and desist order was issued by the securities commissioner pursuant to K.S.A. 17-1266a(b) on March 6, 1985. That order was issued ex parte without an opportunity for ASC and CFI to be heard. On March 7, 1985, ASC and CFI filed a petition for injunctive relief and a motion for a restraining order, restraining the commissioner from enforcing his temporary cease and desist order issued the previous day.

In response to the motion filed by ASC and CFI, the district court entered an ex parte temporary restraining order pursuant to K.S.A. 60-903 for the reason that it appeared in the verified application of the plaintiffs that irreparable injury would result to their business if a cease and desist order were issued without affording them an opportunity to be heard. The commissioner then filed a motion to set aside the temporary restraining order and to dismiss the case. The district court afforded the parties a

hearing and denied that motion on the basis that the securities commissioner had not demonstrated that irreparable harm to the public would result if his cease and desist order did not become immediately effective. The district court found that the ex parte cease and desist order would have the effect of prohibiting the plaintiffs from carrying on their business and that they were entitled to an evidentiary hearing pursuant to K.S.A. 17-1266a(a). To protect the public, the district court required the plaintiffs to post a bond. At the time of hearing on March 28, 1985, ASC and CFI had deposited $311,000 as a condition for the issuance of the court's temporary order. The securities commissioner then filed a notice of appeal from the order of the district court denying the commissioner's motion to set aside the temporary restraining order, which, in effect, was a *temporary injunction*, because the parties had been provided a hearing. An appeal may be taken from an order of the district court granting a temporary injunction (K.S.A. 60-2102; *Miller v. Huffman,* 191 Kan. 570, 382 P.2d 464 [1963]).

In its appeal before this court, the securities commissioner contends that the district court did not have authority to enjoin the Kansas Securities Commissioner from issuing or enforcing his ex parte temporary cease and desist order against ASC and CFI. Simply stated, the commissioner maintains that an independent judicial action in equity against that administrative agency was not permissible because ASC and CFI failed to exhaust their administrative remedies which were adequate to protect their interests. ASC and CFI contend, in substance, that the district court had equitable jurisdiction to review the ex parte administrative action because the administrative remedy provided was inadequate.

The district court, in its order denying the commissioner's motion to set aside the temporary restraining order, held that, as a court of equity, it had jurisdiction to issue a temporary restraining order or temporary injunction and stated in its memorandum opinion as follows:

"The act for judicial review and civil enforcement of agency actions, K.S.A. 77-601 *et seq.,* makes temporary orders issued by an administrative agency subject to judicial review pursuant to K.S.A. 77-616. This section provides that a court may enjoin a temporary order of an agency if it, inter alia, finds that

'(2) Without relief the applicant will suffer irreparable injury.'
K.S.A. 77-616(c)(2).

"The Kansas Court of Appeals in *Southwestern Bell v. Kansas Corporation Commission*, 6 Kan. App. 2d 444, 629 P.2d 1174 (1981), rehearing denied, 230 Kan. 819, took jurisdiction to review an interim order of the Corporation Commission when it found that injury could result to a party and the procedure for review of the offending order was inadequate. Under these conditions 'equitable relief by independent action may be available in a district court.' 6 Kan. App. 2d at 450, 451. And the United States Supreme Court has noted that procedural rules which satisfy due process in one context may not necessarily satisfy procedural due process in every case. *Bell v. Burson*, 402 U.S. 535, 29 L.Ed.2d 90, 91 S.Ct. 1586 (1971).

"Based upon the foregoing we hold that a District Court has jurisdiction to entertain an independent action for equitable relief from an order of the Securities Commissioner issued under K.S.A. 17-1266a(b) when it is shown from the particular circumstances that irreparable injury will result and that the procedure for review of the order is inadequate to satisfy procedural due process."

As a general rule, courts are reluctant to interfere with an action of an administrative agency until a final order is issued by the agency. The reason is that, absent a final order or decision, the power and jurisdiction of the administrative agency has not been fully and finally exhausted. The controversy is not ripe for equitable intervention. The courts recognize, however, that there are exceptions to the general rule. Equitable jurisdiction of a district court may be invoked for judicial relief from a preliminary order, not yet a final administrative determination, where such order is not immediately reviewable in any other way and the complainants will suffer great and irreparable injury if the order is carried out. We agree with the district court in this case that it had jurisdiction to restrain the operation of the ex parte temporary cease and desist order of the Kansas Securities Commissioner when the court found irreparable injury would result to the business operations of ASC and CFI and that the potential harm to Kansas citizens was minimal.

In this case, the Kansas Securities Act, K.S.A. 17-1269, did not provide for *immediate* review of a temporary cease and desist order. Although ASC and CFI were entitled to an evidentiary hearing under K.S.A. 17-1266a(b), it could take many weeks to complete such a hearing, during which period ASC and CFI would be prohibited from conducting their business. This could well result in irreparable harm to ASC and CFI. Under all the circumstances in this case, we hold that the district court did not err in granting temporary injunctive relief to ASC and CFI. In view of our decision on the issue, we do not deem it necessary to

consider the other issues raised by the securities commissioner in his brief.

For the reasons set forth in this opinion, the judgments of the district court appealed from in Cases Nos. 58,441 and 58,136 are affirmed.