No. 70,084

STATE OF KANSAS, *Appellant*, v. ROBERT EUGENE HOOD, *Appellee*.

(873 P.2d 1355)

Opinion filed April 22, 1994.

*Caroline M. Ong*, special assistant attorney general, argued the cause, and *Robert T. Stephan*, attorney general, was with her on the brief for appellant.

*Ronald P. Wood*, of Gates & Clyde, Chartered, of Overland Park, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

MCFARLAND, J.: This is an appeal by the State pursuant to K.S.A. 1993 Supp. 22-3602(b)(1) from the dismissal of a complaint by the magistrate at the preliminary hearing.

On June 1, 1988, Thomas M. Bowe entered into a written contract entitled "Sales Agreement" with his cousin, Robert Eugene Hood, wherein, for the consideration of $15,000, Bowe purchased 5½ percent of Hood's interest in a restaurant and drinking establishment known as "Bobby Gene's," located in Shawnee Mission. The agreement contained option provisions whereby, for additional payments, Bowe could purchase additional percentages of Hood's interest in the business. Bowe was to receive a percentage of the profits commensurate with his percentage of ownership. Inasmuch as the nature of this transaction is at the heart

of the issues herein, a legal characterization of this transaction and additional facts relative thereto will be discussed later in the opinion. Bowe became dissatisfied with his purchase and brought a civil action against Hood. Bowe obtained a judgment against Hood but was unable to collect the judgment. There are no details before us as to the claims made in the civil action or the amount of the judgment.

Thereafter, on the advice of his attorney, Bowe contacted the Office of the Securities Commissioner of Kansas. That office investigated the transaction and concluded that the Bowe/Hood agreement was an investment contract within the purview of the Kansas Securities Act (K.S.A. 17-1252 *et seq.*) and that Hood's personal usage of the $15,000 received from Bowe (as opposed to the investment of same in the business) constituted a violation of K.S.A. 17-1253(a)(3). Said statute provides:

"(a) It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly, to:

. . . .

(3) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

Caroline M. Ong, Associate General Counsel for the Office of the Securities Commissioner of Kansas in her capacity as Special Assistant Attorney General, filed a complaint/information in the Johnson County District Court charging Hood with violation of K.S.A. 17-1253(a)(3). The penalty for the willful violation of the statute is a fine of not more than $5,000 and/or imprisonment of up to three years. K.S.A. 17-1267.

The case was called for preliminary hearing on June 1, 1993. The magistrate concluded that the State had not presented sufficient evidence to establish probable cause to believe that defendant had violated K.S.A. 17-1253(a)(3) and dismissed the complaint without prejudice.

The rules concerning a preliminary hearing are well settled. In Kansas, the preliminary hearing affords the person arrested, as a result of a complaint, an opportunity to challenge the existence of probable cause for further detention or for requiring bail. The preliminary hearing apprises the accused about the nature of the

crime charged and the sort of evidence he or she will be required to meet when subjected to final prosecution. *State v. Sherry*, 233 Kan. 920, Syl. ¶ 3, 667 P.2d 367 (1983). A preliminary hearing is not a trial of the defendant's guilt; it is rather an inquiry whether the defendant should be held for trial. *State v. Jones*, 233 Kan. 170, Syl. ¶ 1, 660 P.2d 965 (1983). In order to bind a defendant over for trial at a preliminary hearing, it must appear to the magistrate that a crime has been committed and that there is probable cause to believe the defendant committed a felony. *State v. Burrell*, 237 Kan. 303, 305, 699 P.2d 499 (1985). "Probable cause" means a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a reasonable belief that the person accused committed the offense with which he is charged. *State v. Huff*, 235 Kan. 637, Syl. ¶ 3, 681 P.2d 656 (1984); *State v. Howland*, 153 Kan. 352, Syl. ¶ 4, 110 P.2d 801 (1941). See *State v. Chapman*, 252 Kan. 606, Syl. ¶ 4, 847 P.2d 1247 (1993).

This court has the advantage of being able to look at the preliminary hearing transcript objectively and from a distance. From this vantage point it is easy to see what went wrong as far as the State's case was concerned.

The securities commissioner's office investigated the facts and concluded the Bowe/Hood transaction was an investment contract, which is included in the definition of "security" contained in K.S.A. 17-1252(j) and, therefore, within the purview of the Kansas Securities Act. Inasmuch as Hood used the $15,000 received from Bowe for personal purposes as opposed to investing the same in the business, it was concluded this was a violation of K.S.A. 17-1253(a)(3) as it was an "act, practice or course of business which operates or would operate as a fraud or deceit" upon Bowe. Hood was so charged. Ong obviously believed she had established a clear violation by Hood of the statute by her evidence of the contract and Hood's usage of the funds received therefrom in the preliminary hearing. Accordingly, the magistrate's dismissal of the complaint came as a complete surprise to the prosecution.

The State did not refile or alter its approach. Rather, in this appeal, the State is seeking to establish the dismissal was erro-

neous. The State contends the magistrate did not understand the transaction was an investment contract, improperly excluded parol evidence, and misconstrued what conduct is prohibited by K.S.A. 17-1253(a)(3). The record, however, does not establish the dismissal was erroneous.

The problem lies in the State's failure to establish that the Bowe/Hood transaction constituted an investment contract. A wide variety of schemes, plans, and arrangements have been held to constitute investment contracts. See 22A Words and Phrases, Investment Contract. The common thread is the investing of money into a common enterprise with the expectation of future profits from the utilization of the money by others. In *Activator Supply Co. v. Wurth*, 239 Kan. 610, Syl. ¶ 4, 722 P.2d 1081 (1986), we held:

"The test to be applied in determining whether or not a particular financial relationship constitutes an investment contract is whether the contractual arrangement involves an investment of money in a common enterprise with the profits to come from the efforts of others."

The State contends the transaction was an investment in the business with said funds to be utilized in the business to produce profits and, hence, an investment contract. Therefore, under the State's theory, Hood's usage of the $15,000 for personal purposes violated the statute under which he was charged.

The written agreement between the parties is as follows:

### "SALES AGREEMENT

"THIS AGREEMENT, made this 1 day of June, 1988, between Bobby Hood, hereinafter called the seller, and Thomas M. Bowe, hereinafter called the buyer.

"WITNESSETH:

"In consideration of the mutual covenants and agreements herein contained, the seller and buyer agree as follows:

1. The seller agrees to sell to buyer, upon payment of the purchase price set out in paragraph 2 herein, five and one-half percent (5½%) of his interest in the restaurant and drinking establishment commonly known as Bobby Gene's as of the date of this agreement. Such sale of the seller's interest shall include all of his interest in Bobby Gene's, including his goodwill and his rights to use the premises, to conduct business as a restaurant and drinking establishment, and his interest in the assets to the extent of the percentage stated above. As further consideration for this agreement, the seller and buyer covenant and agree more specifically as follows:

2. The buyer agrees to pay the sum of Fifteen Thousand Dollars ($15,000) cash in hand for five and one-half percent (5½%) of seller's interest as stated in paragraph 1. Buyer shall have the option of purchasing an additional four and one-half percent (4½%) of seller's interest in increments of one percent (1%) based upon a purchase price of Two Thousand Seven Hundred Fifty Dollars ($2,750) per one percent (1%). Such purchases may be made from buyer's share of the profits, based upon his prevailing percentage of ownership in the assets of Bobby Gene's, figured on a quarterly basis. The first quarterly calculation of profit, if any, shall be made three (3) months from the date of this agreement and shall reoccur on a three (3) month basis thereafter. As the buyer's percentage ownership increases, he shall receive a prorated and similar percentage of the profits based on the foregoing quarterly calculation. The parties agree that the buyer may purchase more than ten percent (10%) in one percent (1%) increments based upon the parties' agreement to agree from time to time as circumstances dictate.

"3. It is further agreed by the parties that in the event that the buyer should become deceased, then his present prevailing interest in Bobby Gene's shall be transferred by the seller to the buyer's spouse and she shall succeed to all of buyer's interest herein, and shall be entitled to the options to purchase up to ten percent (10%) of the business interest, or to a distribution of the percentage profit as specified, with full rights and powers as though she were the buyer herein.

"4. The closing of this sale shall take place on June 1, 1988, and shall be determined completed upon buyer's payment of the sum of the purchase price, in cash, to seller.

"5. All the terms and provisions of this agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the seller and of the buyer.

"IN WITNESS WHEREOF, the parties have duly executed this agreement on the date and year first above written.

"/s/ Bobby Hood
Bobby Hood      Seller

"/s/ Thomas M. Bowe
Thomas M. Bowe      Buyer"

The contract in question is entitled "Sales Agreement." Such terminology is not controlling, however. See *Activator Supply Co. v. Wurth*, 239 Kan. 610.

The agreement stated the buyer is purchasing a percentage of the seller's interest in the business and will receive that same percentage of the seller's profits from the business. Nowhere is there any language indicating that the $15,000 is to be invested

in the business and become a part of the capital of the company. Expansion or improvement of the business by virtue of the $15,000 is not mentioned. Nothing in the contract indicates the business will, in any way, be affected by the transaction. Rather, it is a side agreement between the owner of an interest in the business to sell a part of his interest in the business. Based upon the agreement itself, Bowe could have no claim against the business itself, as a separate entity, as his money is not going to the business. We know that Hood purchased the business by buying the corporation that owned and operated it. The record contains little information about the sale except the installment payments thereon were not completed until several months after the transaction herein. Presumably, the sale of the corporation consisted of the purchase of its stock. Whether Hood operated the business as a corporation, we do not know. The business ultimately failed, presumably, at least in part, due to the foreclosure of a large tax lien. The Bowe/Hood contract does not state what interest Hood owned in the business. Bowe was only purchasing a percentage of whatever interest Hood had in the business.

One of the claims of error herein is that the magistrate improperly excluded certain parol evidence. This was testimony from Bowe as to his understanding of what he was buying and the alleged misrepresentation and omission by Hood as to Hood's interest and the extent of the business' assets.

Before proceeding further, it is significant to note that Hood was not charged with making false statements about the business to induce Bowe to part with his money. Such conduct is prohibited in connection with the sale of securities under a different section (K.S.A. 17-1253[a][2]) of the statute under which Hood is charged. Also, no charge under K.S.A. 17-1253(a)(1) is made. For comparison purposes, K.S.A. 17-1253(a)(1), (2), and (3) are set forth herein as follows:

"(a) It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly, to:

(1) Employ any device, scheme or artifice to defraud;

(2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

Rather, the State proceeded on the theory that Hood's usage of the $15,000 for personal purposes, as opposed to its utilization in the business, was an act, practice, or course of conduct violative of K.S.A. 17-1253(a)(3). The personal usage of the $15,000 would be violative of the statute only if the transaction were an investment contract.

It was, therefore, incumbent upon the State to establish that the Bowe/Hood transaction was an investment contract. The only evidence relative to the transaction before the court was the written agreement and Bowe's testimony. Bowe's testimony and the State's comments therein, relative to the purpose of certain portions thereof, are significant. Illustrative of Bowe's testimony are the following excerpts from his direct testimony:

"Q. What was your $15,000 to be used for?

"A. The money was to be used for—to go into the business itself, to be put back into the business, and for furnishings, maybe a juke box or whatever, to enhance the environment or whatever, just for the operational purposes of the club.

"Q. Was any of the money to be used for nonbusiness purposes?

"A. No, it was not.

. . . .

"Q. Mr. Bowe, what was your arrangement with Mr. Hood regarding profits from the business of Bobby Gene's?

"A. It was an understanding between he and I that the profits would be put back into the business itself, you know, to add—you know, to accumulate."

At this point the following exchange occurred between court and counsel:

"MR. WOOD [defense counsel]: Your Honor, I'm going to object to that at this time and invoke—*there is a sales agreement, and we would think that the parol evidence rule would apply on this*, Your Honor. There is an agreement, and we would object to that line of questioning.

"JUDGE CLEAVER: Sustained.

*"Parties did have a written agreement, didn't they?*

"MS. ONG: *Yes, Your Honor, I'm not attempting to alter those terms at all, just to go into subsequent discussions.* The agreement provides for profits and for an option as to how they're handled, and what I'm asking Mr. Bowe to do is to explain which way they were handled. There is an option of receiving the payment.

"JUDGE CLEAVER: Wait a minute. *There's a written agreement setting forth what the parties intended—*

"MS. ONG: *Yes.*

"JUDGE CLEAVER: —is that correct?

"MS. ONG: Yes, sir. Exhibit 2.

"JUDGE CLEAVER: *And you're prepared to alter the terms of that by testimony; is that correct?*

"MS. ONG: *No, sir. It proposes an option for reinvestment, and I'm merely asking Mr. Bowe to explain whether that option was chosen or not.*" (Emphasis supplied.)

After the explanation was made as to the limited purpose the evidence was being offered for, the court permitted the testimony, subject to a later motion to strike (which was not made).

Clearly, the State advised the court that Bowe's testimony was not being offered to alter the terms of the written contract. The court then had to decide the matter of whether or not it was an investment contract on the basis of the written contract alone. On appeal, the State contends the court improperly excluded parol evidence. The record reflects: (1) the testimony was not excluded; (2) it was not parol evidence offered to vary the terms of the written contract; and (3) there is no indication in the record the court did not consider Bowe's testimony for the limited purpose for which it was offered. Nowhere in the record does Bowe even testify that Hood told him the money he paid would be used in the business.

On appeal, the State argues that the oral evidence as to how the money was to be used constituted a separate contract and not an attempt to contradict or vary the terms of the written contract. This was not argued to the trial court and is contrary to the limited purpose for which the State advised the court it was offering the evidence.

Alternatively, the State argues:

"Additionally, the parol evidence rule has no application in situations where an agreement is induced or procured by fraud. When fraud is the issue, parol evidence is admissible·to amend or vary the terms of a written agreement. *State v. Handke*, 185 Kan. 38, 46, 340 P.2d 877 (1959); *Stegman v. Professional & Business Men's Life Insurance Co.*, 173 Kan. 744, 750-51, 252 P.2d 1074 (1953). The fraud exception to the parol evidence rule is long-standing and well recognized. *Boxer v. Watchorn Oil & Gas Company*, 120 Kan. 278, 280, 243 Pac.

316 (1926); *Edwards v. Phillips Petroleum Company,* 187 Kan. 656, 360 P.2d 23, 26 (1961). In 1915, the Kansas Supreme Court stated:

'The rule that parol testimony cannot be used to vary the terms of a written instrument has no application to an issue of fraud in the making or procuring of the contract. The courts will not permit their hands to be tied in the administration of justice by restricting the realm of inquiry on an issue of fraud, and such an issue may be maintained by any testimony competent under the ordinary rules of evidence. Were this not so, fraudulent contracts could seldom be overturned if the perpetrators of the fraud had the foresight to have their contracts reduced to writing and executed.' *Hart v. Haynes,* 96 Kan. 262, 265, 150 Pac. 530 (1915)."

The State cannot be permitted to advise the lower court that evidence is not being offered to vary or alter the terms of the written contract and then claim error on appeal on the basis that the evidence should have been considered for such purpose.

In its brief, the State also attempts to use Bowe's testimony to establish fraudulent conduct on Hood's part in violation of K.S.A. 17-1253(a)(3). Bowe's testimony contains very few statements attributable to Hood. The State's brief makes the following statement:

"The State presented evidence of several specific ways in which the defendant's conduct would operate as a fraud or deceit upon any person.

"Bowe testified that the defendant told him that he owned the bar and restaurant business known as Bobby Gene's. Bowe understood that the defendant owned 100% of the business and the building it was in, and that he was buying a percentage of the defendant's business. Bowe was not told of any liens or loans on the business. The evidence at the preliminary hearing showed that the defendant's business was in debt at the time of the defendant's transaction with Bowe, and that the defendant did not own the building, but rented it."

Even if Bowe's testimony is elevated to the status as being evidence of fraudulent statements or omissions, such cannot be used as "conduct" under K.S.A. 17-1253(a)(3) when 17-1253(a)(2) is a specific statute covering fraudulent verbal statements and omissions.

We conclude that, as presented to the magistrate at the preliminary hearing, the State had to show the transaction was an investment contract. The State, by its own statements to the court, limited the court to consider only the written contract in making the determination of whether the transaction was an investment

contract. The magistrate's rationale for the dismissal, as stated at the end of the preliminary hearing, is not specifically stated. However, it is clear that his problem lay with the contract itself. The court stated that Hood's personal usage of the $15,000 was not inconsistent with the contract. Had the transaction been an investment contract, Hood's personal utilization of the $15,000 would be a violation of K.S.A. 17-1253(a)(3). The dismissal was based on the State's failure to establish that the transaction was an investment contract. We conclude the record supports the magistrate's determination that the charged violation of the Kansas Securities Act had not been sufficiently established to bind the defendant over for trial.

The judgment is affirmed.

ABBOTT, J., concurring: Once again, I would suggest to the legislature that K.S.A. 1993 Supp. 22-3602(b) be repealed. K.S.A. 1993 Supp. 22-3602(b) allows the State to take a direct appeal to the Supreme Court from an order dismissing a complaint, information, or indictment. As a result, this court hears appeals from misdemeanor cases and probable cause hearings on a regular basis. This is a waste of this court's time in most instances and, more importantly, takes space on the docket which could be better used to hear cases that have issues of great importance to the people of this State.

This case is a prime example of the problem as I view it. This case is a dismissal at the preliminary hearing stage. The State has the absolute right to refile the criminal charges at any time before the statute of limitations expires. Instead, it filed an appeal directly to the Supreme Court.

By statute, preliminary hearings are heard by one judge and at the lowest level possible in the judicial system. The issue in all preliminary hearings is whether a crime has been committed and whether there is probable cause to believe the accused committed the crime. In an appeal, *seven*, not one, Supreme Court justices read a cold record and make the same type of determination one magistrate made in the first instance.

After seven justices, on appeal, give the State a new preliminary hearing based on the record presented, if the State again loses

and the statute of limitations has not expired, it can refile the same criminal charges and start over at the magistrate level before a single judge.

As to the remaining statutory direct appeals, the appeals should be to the Court of Appeals (as should the preliminary hearing appeals). The vast majority of the cases directly appealed to this court which are of no real significance to the law could be handled by a three-member panel of the Court of Appeals rather than by the seven Supreme Court justices. That would be a substantial saving of judicial time. If the issue is significant it will reach the Supreme Court.

I have not conducted a study on the number of such cases, but over 10 percent of the current docket are State appeals under K.S.A. 1993 Supp. 22-3602(b). It is a rare docket that does not contain from one to three such appeals. A cursory look at the opinions filed by the Court of Appeals shows the Court of Appeals is hearing cases of significant public interest and cases that are important to the development of the law which should be heard by the Supreme Court.

I urge the legislature to repeal or amend K.S.A. 1993 Supp. 22-3602(b) to open more space on the Supreme Court's docket which will give this court discretion to fill its docket with cases that are of more importance to the people of this state.

LOCKETT, J., dissenting: The purpose of the Kansas Securities Act (K.S.A. 17-1252 *et seq.*) is to place the promoting and dealing in speculative securities under rigid governmental regulation and control to protect investors by preventing the sale of fraudulent and worthless speculative securities. Speculative securities include those of which the value materially depends upon proposed or promised future promotion or development, rather than on present tangible assets or conditions. The test to be applied in determining whether a particular financial relationship constitutes an investment contract is whether the contractual arrangement involves an investment of money in a common enterprise with the profits to come from the efforts of others. *Activator Supply Co. v. Wurth*, 239 Kan. 610, Syl. ¶¶ 1, 2, 4, 722 P.2d 1081 (1986).

We differ from the majority's conclusion that nowhere in the record does Bowe testify that Hood told him the money Bowe paid would be used in the business. At the preliminary examination, the State presented evidence to support its charge that the defendant had engaged in "acts, practices, or a course of business . . . that would operate as a fraud or deceit upon any person." The contract and the testimony of Bowe as to the reasons that he invested $15,000 for 5½ percent of Hood's interest in the restaurant and drinking establishment were admitted as evidence. When Bowe was asked what his $15,000 was to be used for, Bowe testified: "Fifteen thousand was the purchase of the percentage into the business, of Bobby Gene's, and also the money was supposed to have been put back into the establishment to buy the accouterments or whatever."

At the conclusion of the preliminary examination, the following colloquy took place between the magistrate and the prosecuting attorney:

"JUDGE CLEAVER: . . . I'm just going to be quite blunt: I am not—I'm certainly not condoning what apparently happened with Mr. Hood, but I don't know that it rises to the level of a violation of the law. And the Court's concern is that the careful reading of this agreement is that the seller agrees to sell to buyer. Now, the seller is Bobby Hood. According to this agreement, whatever interest Bobby Hood would have had in that business, if it was, indeed, a corporation—which the testimony before this Court is that it was a corporation—then it obviously would have been a personal sale of stock.

"And based on the facts that the State has adduced at this point, I'm just not sure that the evidence is clear that it would have been his money to do with what he wanted to do. I'm not quite following the State's argument. This agreement says that he, as an individual, is selling his interest. Well, the agreement is totally inadequate. We can all—I think we can all safely say that, in terms of identifying exactly what that interest was.

"But the only testimony before this court—and that was, I believe, by Mr. Duncan—was that he sold the corporation by the name of PD Enterprises to Mr. Hood. It's not clear to the Court exactly who was operating this entity called Bobby Gene's. But at this point, the Court, you know, quite frankly, would find that there's not sufficient evidence to bind over. Now, that doesn't mean that State can't refile, but currently, there just really isn't evidence as to what exactly was sold. If it was stock, then the money would have been Bobby Hood's to do with as he wishes.

"MS. ONG: Your Honor, I don't know if you're going to want us to file— our contention is—

"JUDGE CLEAVER: Right now I think the Court is going to dismiss it. You can certainly refile. But based upon what's filed, on the evidence before this Court, the evidence is that it was a corporation. Counsel agree with that?

"MS. ONG: Not—no, Your Honor. It was an interest in a business. Our contention is that this was an investment contract, which is a type of security. And this was not a sale of stock in a normal sense at all. This was an irregular transaction which is—an investment contract as defined as a security under 17-1252(j). That is our basis for finding the violation and that it falls under the Act. This was not a normal stock arrangement. They—

"JUDGE CLEAVER: I guess the problem I'm having is that you're alleging that this individual took money that was given to him and used it for his own personal use.

"MS. ONG: Yes, we were alleging money was given to him for a particular purpose, for an investment purpose.

"JUDGE CLEAVER: You said that you weren't adducing any testimony to amend the agreement. The agreement is clear on its face. It was to sell a five and a half percent interest in a restaurant, right?

"MS. ONG: Yes, sir.

"JUDGE CLEAVER: Is there anything in this agreement that requires that Mr. Hood to do anything with that money specifically? Is there—

"MS. ONG: What is it that—if we're looking at this agreement, what is it that Mr. Hood was supposed to do with that money that he didn't do? Put it in the business, Your Honor.

"JUDGE CLEAVER: I don't believe that's what this agreement calls for.

"MS. ONG: Your Honor—

"JUDGE CLEAVER: This agreement calls for the — Mr. Hood to sell Mr. Bowe five and a half percent of his interest in the restaurant and drinking establishment, correct?

"MS. ONG: Yes, sir.

"JUDGE CLEAVER: I don't see that it requires Mr. Hood to do anything else now.

"MS. ONG: Our contention, Your Honor, is that the transaction, under the law as it's written in 1253(a)(3) that the acts, practices and course of business would offer as a fraud upon the purchaser of the security because—

"JUDGE CLEAVER: Counsel, I don't think that law is that vague, and if the State wishes to allege a criminal conduct and file it, then it must do so specifically so that the defendant can be aware—apprised of exactly what it is he's accused of doing.

"At this juncture, the Court does not believe there's probable cause to believe that a violation of the law occurred."

When the magistrate discharged the defendant, he considered only the written agreement and disregarded Bowe's testimony that he had purchased the security agreement because Hood had

agreed to invest the $15,000 purchase money in the business. The magistrate's explanation for discharging the defendant is that he was not allowing any testimony to amend the written agreement, or any testimony relating to anything not stated in the agreement.

The magistrate based his ruling on the parol evidence rule, which prevents the admission of parol evidence to vary terms of unambiguous written contracts in civil contract disputes. See *Colt Co. v. Kocher*, 123 Kan. 286, 255 Pac. 48 (1927). However, that rule does not prevent consideration of the introduction of testimony in all situations. Two exceptions to the rule of exclusion of parol evidence are applicable to this criminal matter.

First, the oral agreement as to investing money to improve the business can be admitted to show why Bowe purchased the security. Bowe testified that the purchase money was to be used for improvement of the business and not for the defendant's personal expenses. This testimony did not contradict or vary the terms of the written agreement. The oral testimony related to a separate agreement that resulted in the purchase of the security. It shows why the contract was entered into by the parties. *State v. Atwood*, 187 Kan. 548, 358 P.2d 726 (1961).

Additionally, the parol evidence rule has no application in situations where an agreement is induced or procured by fraud. The fraud exception to the parol evidence rule is longstanding and well recognized in civil and criminal law. *Edwards v. Phillips Petroleum Co.*, 187 Kan. 656, 659, 360 P.2d 23 (1961); *Boxer v. Watchorn Oil & Gas Co.*, 120 Kan. 278, 280, 243 Pac. 316 (1926).

Citing *Hart v. Haynes*, 96 Kan. 262, 265, 150 Pac. 530 (1915), the majority recognizes that the rule that parol testimony cannot be used to vary the terms of a written instrument has no application to an issue of fraud in the making or procuring of the contract. The majority states that courts will not permit their hands to be tied in the administration of justice by restricting the realm of inquiry on an issue of fraud, and such an issue may be maintained by any testimony competent under the ordinary rules of evidence. It concludes were this not so, fraudulent contracts could seldom be overturned if the perpetrators of the fraud had the foresight to have their contracts reduced to writing and executed.

The only crime charged in this case was securities fraud, a violation of K.S.A. 17-1253(a)(3). The complaint/information contained a detailed statement of a series of acts by the defendant that it alleged would operate as a fraud or deceit. The State's allegations, in part, were that the signing of the written contract and the payment of money to the defendant were induced or procured by a series of fraudulent misrepresentations and omissions made by the defendant. The trial court should have looked beyond the language of the written contract to determine if fraud had occurred. The trial court's refusal to consider the evidence outside of the written agreement that supported the fraud charge is clearly erroneous.

Here, there was evidence that the parties entered into a contractual arrangement which involved an investment of money in a common enterprise with the profits to come from the efforts of others. The parol testimony that the purchase money was to be used to improve the business was not introduced to vary the terms of the security agreement but to show that Hood misled Bowe and actually intended to use the purchase money for his (Hood's) own needs and wants. The parol evidence rule on exclusion of oral testimony has no application to the issue of whether Hood actually intended to use the purchase money for personal use rather than for improving the business as promised. There was sufficient evidence for the magistrate to find that it appeared a violation of the Kansas Securities Act had been committed and there was probable cause to believe that the defendant committed the felony.

SIX, J., concurring and dissenting. I concur in Justice Abbott's observation concerning K.S.A. 1993 Supp. 22-3602(b), and I join Justice Lockett's dissenting opinion.