NOT DESIGNATED FOR PUBLICATION

No. 120,607

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CoreFirst Bank & Trust,
f/k/a Commerce Bank & Trust
*Appellant*,

v.

Gary L. Weigel
and Bonita K. Weigel, et al.,
*Appellees*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; Franklin R. Theis, judge. Opinion filed April 17, 2020. Affirmed.

*R. Patrick Riordan* and *Erin A. Beckerman*, of Riordan, Fincher & Beckerman, P.A., of Topeka, for appellant.

*Terry A. Iles*, of Law Office of Terry A. Iles, of Topeka, for appellees.

Before Gardner, P.J., Buser, J., and Burgess, S.J.

Per Curiam: CoreFirst Bank & Trust appeals the district court's decision about a commercial guaranty and debt owed by Gary and Bonita Weigel. The district court found that Gary's guaranty applied to only one promissory note referenced in the guaranty, rather than to all the indebtedness of the debtor to CoreFirst. CoreFirst argues that the district court ignored the "four corners" rule of contract interpretation by considering extrinsic evidence before finding the guaranty ambiguous. It then argues that the guaranty was not ambiguous, was continuing, and was not limited to only one note. We find that

1

the district court properly considered the guaranty's related documents in finding the guaranty ambiguous and properly found that Gary Weigel guaranteed only one note. Finding no reversible error, we affirm.

*Factual and Procedural Background*

Gary executed a commercial guaranty in favor of CoreFirst in 2007. The guaranty was secured by a mortgage for two adjoining parcels of real estate in Tecumseh—one parcel was the Weigels' residential property and the other was a rental property. The contract guaranteed repayment of debt owed by KMCC, Inc. CoreFirst and KMCC had entered into several commercial loan agreements over the years. The loans at issue on appeal were made from 2007 to 2010.

KMCC eventually defaulted on its loans and CoreFirst sought reimbursement for these debts:

| Loan No. | Principal | Interest/Costs/Fees | Total |
|---|---|---|---|
| ****9900 | $57,258.65 | $33,954.66 | $91,213.31 |
| ****0783 | $61,819.61 | $36,659.11 | $98,478.72 |
| ***2327 | $27,286.23 | $20,874.88 | $48,161.11 |
| ***2394 | $32,320.77 | $65,260.19 | $97,580.96 |
| ****9875 | $436,000.01 | $321,029.07 | $757,029.08 |
| Totals | $614,685.27 | $477,777.91 | $1,092,463.18 |

CoreFirst made a demand on Gary under his commercial guaranty but he refused to pay. As a result, CoreFirst filed a foreclosure action.

CoreFirst's amended petition claimed Gary owed $727,777.91, which reflected $250,000 in principal and $477,777.91 in interest, costs, and fees. CoreFirst also sought

to foreclose the Weigels' mortgage. In due course, CoreFirst moved for summary judgment. Gary responded that his guaranty applied only to a single promissory note referenced in the guaranty and that the mortgage covered only the Weigels' residential property, not their rental property. The district court denied the summary judgment motion and set the case for a bench trial.

At trial, the parties' exhibits were admitted without objection. CoreFirst admitted copies of the commercial guaranty, mortgage, forbearance agreement, and all promissory notes between CoreFirst and KMCC. The Weigels admitted, among other documents:

- commercial guaranties executed by the president of KMCC (Mark Boling), his wife, and CoreFirst; and
- a letter from Michael Meyers (the senior vice president of CoreFirst's commercial loan department) to the Bolings' realtor.

Gary contrasted his guaranty, which expressly referenced only a single promissory note, with Bolings' guaranties, which expressly referenced without limitation all of the borrower's notes.

In its memorandum opinion, the district court found that the mortgage covered both the Weigel residence and the rental property. No one challenges that ruling on appeal. The district court also determined the scope of Gary's guaranty. It considered extrinsic evidence to find the intent of the parties and found the guaranty ambiguous. The district court then found that the guaranty applied to only one of KMCC's promissory notes—Note 9681, later renewed as Note 2327. As a result, the district court found the Weigels owed $27,286.23 and foreclosed the mortgage on both properties.

CoreFirst timely appeals, arguing that Gary's guaranty is unambiguous, is continuing, and applies to all of KMCC's debts with CoreFirst.

3

*Did the District Court Err in Considering Evidence Other Than the Guaranty in Finding the Guaranty Ambiguous?*

CoreFirst first argues that the district court erred in considering extrinsic evidence. CoreFirst argues that the guaranty was unambiguous, so the district court erred by considering other evidence in concluding that the guaranty was restricted and applied only to one of KMCC's loans.

*Standard of Review*

An appellate court exercises unlimited review over the interpretation and legal effect of written instruments and is not bound by the lower court's interpretations or rulings. *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016). And whether a written instrument is ambiguous is a question of law subject to de novo review. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 964, 298 P.3d 250 (2013).

*Analysis*

CoreFirst first argues that the district court erred in not looking solely to the guaranty in finding it ambiguous. Instead, CoreFirst maintains that the district court used circular logic by determining that it could look to extrinsic evidence to decide the scope of the guaranty—"by relying on extrinsic evidence, the district court finds the guaranty to be ambiguous, and consequently, the district court uses that extrinsic evidence it has already considered to resolve that ambiguity."

The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction. See *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015). So CoreFirst contends the court should construe

and consider the entire instrument "'from its four corners.'" *Wasinger v. Roman Catholic Diocese of Salina*, 55 Kan. App. 2d 77, 80, 407 P.3d 665 (2017).

CoreFirst is correct that our law generally precludes a court's consideration of other evidence in finding a document to be ambiguous. "If a [guaranty] contract is unambiguous, the court can look only to the four corners of the agreement to determine the parties' intent, harmonizing the language therein if possible." *TMG Life Ins. Co. v. Ashner*, 21 Kan. App. 2d 234, 242, 898 P.2d 1145 (1995). Extrinsic evidence may not be used to construe an unambiguous guaranty. 21 Kan. App. 2d at 242.

And CoreFirst is also correct that the district court appears to have decided that the guaranty was ambiguous by reviewing documents other than the guaranty, namely, the related promissory notes and mortgage:

> "The Weigel guaranty references a note of January 16, 2007 in the amount of $250,000.00, as does the Weigel mortgage, which is the exact dollar limit of the Weigel guaranty, yet the only note advanced before the Court to be tied to the guaranty of that specific date is actually note 9681 for $150,000.00. However, as noted, five other notes were executed at the same time that day, which numbers are each referenced additionally and separately along with Note 9681 on the Weigel mortgage but of which none are documentarily advanced in the record, but Note 9681. This dollar discrepancy between the note referenced by the Weigel guaranty and Note 9681 entered into on that date, which is advanced by Plaintiff as the note referenced in the Weigel guaranty, is the true source of ambiguity, particularly when considering the multiple notes signed that date and the Weigel mortgage's handwritten reference to all six notes, and not, as the Bank argues, the general Language concerning indebtedness versus the particular identification of the indebtedness as expressed for its identification in the Weigel guaranty. Ambiguity diminishes, but not wholly eliminated, if one does not fixate on the loan amount noted and rather relies on the date for the Note and recognizes, as the section of the Weigel guaranty under 'DEFINITIONS' notes, that 'words and terms used in the singular shall include the plural and the plural shall include the singular as the context may require'. See 'DEFINITIONS' *supra*, at p. 24. Considering the term 'Note', in conjunction with the

January 16, 2007 date would be a gateway to including lending under the other notes executed that day."

But the Weigels cite *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 23 Kan. App. 2d 30, 36-37, 926 P.2d 669 (1996), to show the district court could consider the underlying transactions in finding ambiguity. We agree that *Ryco* is on point.

*Ryco* involved the construction of a guaranty. It began its legal analysis by recognizing the rule that the court must look only to the four corners of the agreement to determine the parties' intent:

"The guarantors' liability involves the construction of a written contract. '"Regardless of the construction of the written contract made by the trial court, on appeal a contract may be construed and its legal effect determined by the appellate court." [Citation omitted.]' *TMG Life Ins. Co. v. Ashner,* 21 Kan. App. 2d 234, 241, 898 P.2d 1145 (1995). If a contract is unambiguous, this court must 'look only to the four corners of the agreement to determine the parties' intent, harmonizing the language therein if possible.' 21 Kan. App. 2d at 242. Moreover, the fact that the parties differ as to what an unambiguous contract requires does not force this court to find that the contract was, in fact, ambiguous. 21 Kan. App. 2d at 242." *Ryco*, 23 Kan. App. 2d at 35-36.

But *Ryco* then recognized that a guaranty agreement signed at about the same time as related documents may be read in conjunction with those documents.

"The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow. *Hollenbeck v. Household Bank,* 250 Kan. 747, 751, 829 P.2d 903 (1992). 'Documents which are executed at different times, but in the course of the same transaction concerning the same subject matter, will be construed together to determine the intent of the parties to the contract.' 250 Kan. at 752.
"When a guaranty agreement is executed at about the same time as the underlying transaction between the creditor and debtor, the guaranty is read in

6

conjunction with the underlying documents. In *Federal Land Bank of Wichita v. Krug*, 253 Kan. 307, 856 P.2d 111 (1993), the Supreme Court considered whether there was consideration supporting a buyer's agreement to assume a mortgage on real estate the buyer purchased. In reviewing the facts, the Supreme Court reasoned that the court had to review both the contract to sell the land and the mortgage assumption agreement together. 253 Kan. at 313. 'When one contracts to assume a mortgage even though the documents are executed at different times, but in the course of the same transaction concerning the same subject matter, they will be construed together to determine the intent of the parties to the contract.' 253 Kan. 307, Syl. ¶ 4." 23 Kan. App. 2d at 36-37.

Similarly, our Supreme Court has applied the "'settled rule that documents executed at the same time, with one referring to the other, are to be construed as a single instrument.'" *Shunga Plaza, Inc. v. American Employers' Ins. Co.*, 206 Kan. 16, 19, 476 P.2d 642 (1970); see also *Overland Park Savings & Loan Ass'n v. Miller*, 243 Kan. 730, 738, 763 P.2d 1092 (1988) (finding a contract of guaranty is to be construed according to the intention of the parties, which is determined by a reasonable interpretation of the language used in light of the circumstances).

We apply *Ryco*'s rule here—Gary's guaranty may be read in conjunction with its related documents. And we need not speculate as to which documents are related because Gary's guaranty tells us. It defines "related documents" as:  "[A]ll promissory notes[,] credit agreements[,] loan agreements[,] environmental agreements[,] guaranties[,] security agreements[,] mortgages[,] deeds of trust[,] security deeds[,] collateral mortgages[,] and all other instruments[,] agreements[,] and documents[,] whether now or hereafter existing[,] executed in connection with the Indebtedness."

"Indebtedness" is defined twice in Gary's guaranty. It is most specifically defined as "Borrower[']s indebtedness to Lender as more particularly described in this Guaranty." The Weigels' mortgage, all notes executed on January 16, 2007, and the Boling

guaranties executed on January 16, 2007, are thus among the related documents that the district court could consider in determining the ambiguity of Gary's guaranty.

We thus find no error in the district court's reliance on the notes, the mortgage, and other related documents in determining ambiguity. To the extent the district court may have also relied on parol or other evidence in finding ambiguity, any such error is harmless because, as we explain below, Gary's guaranty is ambiguous even without considering parol or other evidence.

*Did the District Court Err in Finding the Guaranty is Ambiguous?*

CoreFirst contends that Gary's guaranty is not ambiguous because it clearly shows that it is continuing and unrestricted. Gary counters that the guaranty is ambiguous because it includes language indicating Gary's guaranty is both continuing and restricted.

Our Supreme Court has distinguished between a continuing guaranty and a restricted guaranty:

> "A guaranty may be either continuing or restricted. The contract is restricted if it is limited to guarantee a single transaction or a number of specific transactions and is not effective for transactions other than those guaranteed. The contract is continuing if it contemplates a future course of dealing during an indefinite period or it is intended to cover a series of transactions or a succession of credits, or if its purpose is to give to the principal debtor a standing credit to be used by him from time to time." *Iola State Bank v. Biggs*, 233 Kan. 450, 454, 662 P.2d 563 (1983).

Our Supreme Court has provided basic guidance about the purpose and scope of guaranties:

"'If a guaranty is free from ambiguity, it is strictly construed in favor of the guarantor. *Scott v. City of Tampa,* 158 Fla. 712, 30 So. 2d 300, 302, *cert. denied,* 332 U.S. 790, 68 S. Ct. 99, 92 L. Ed. 372 (1947). If ambiguous, it is construed against the drafter—here, the Bank and its assignee, the FDIC. *See Miami Nat'l Bank v. Fink,* 174 So. 2d 38, 40 (Fla. 3d DCA), *cert. denied,* 180 So. 2d 658 (Fla. 1965). A guaranty is a collateral promise to answer for the debt or obligation of another. *Nicolaysen v. Flato,* 204 So. 2d 547, 549 (Fla. 4th DCA 1967), *cert. denied*, 212 So. 2d 867 (Fla. 1968). The extent of the guarantor's liability depends upon the language of the guaranty itself and is usually equal to that of the principal debtor. 38 Am. Jur. 2d *Guaranty* § 74 (1968). "[A] guarantor is liable only in the event and to the extent that his principal is liable." *Id.* at § 77.'" *Overland Park Savings & Loan Ass'n*, 243 Kan. at 741.

Our law regarding ambiguity is well established. "'The language in a contract is ambiguous when the words used to express the meaning and intention of the parties are insufficient in the sense that the contract may be understood to reach two or more possible meanings." *McBride Electric, Inc. v. Putt's Tuff, Inc.*, 9 Kan. App. 2d 548, 555, 685 P.2d 316 (1984) (construction of guaranty contract); accord *Brown v. Lang*, 234 Kan. 610, 615, 675 P.2d 842 (1984). In determining whether a contract is ambiguous, the court must not read one part of the contract to the exclusion of another. *Ashner*, 21 Kan. App. 2d at 249. The court will not strain to find an ambiguity where, in common sense, there is none. *Iron Mound v. Nueterra Healthcare Management*, 298 Kan. 412, 420, 313 P.3d 808 (2013).

Having reviewed the applicable law, we turn to the facts. CoreFirst points to several provisions in the guaranty that show Gary's guaranty was broad and continuing. First, the first and seventh paragraphs of the guaranty are titled "CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE" and "CONTINUING GUARANTY." And the last sentence of the first paragraph unequivocally states that "Guarantor[']s obligations are continuing." The paragraph reads:

9

"For good and valuable consideration Guarantor absolut[e]ly and unconditionally guarantees full and punctual payment and satisfaction of Guarantor[']s Share of the Indebtedness of Borrower to Lender and the performance and discharge of all Borrower[']s obligations under the Note and the Related Documents[.] This is a guaranty of payment and performance and not of collection so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender[']s remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness this Guaranty or any other guaranty of the Indebtedness[.] Guarantor will make any payments to Lender or its order on demand in legal tender of the United States of America in same day funds without set off or deduction or counterclaim and will otherwise perform Borrower[']s obligations under the Note and Related Documents[.] Under this Guaranty  Guarantor[']s obligations are continuing[.]"

Second, a provision entitled "CONTINUING GUARANTY" states that the guaranty is continuing and applies to future debt:

"CONTINUING GUARANTY[.] THIS IS A CONTINUING GUARANTY UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCUTAL PAYMENT[,] PERFORMANCE[,] AND SATISFACTION OF THE GUARANTOR[']S SHARE OF THE INDEBTEDNESS OF BORROWER TO LENDER NOW EXISTING OR HEREAFTER ARISING OR ACCQUIRED ON A CONTINUING BASIS[.] ACCORDINGLY ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR[']S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME[.]"

Third, under the first of two definitions of "Indebtedness," Gary was liable for future debts:

"Indebtedness . . . means all of the principal amount . . . and all debts[,] liabilities[,] and obligations of every nature or form now existing or hereafter arising or acquired that Borrower individually or collectively or interchangeably with others owes or will owe

10

Lender[.] Indebtedness includes . . . loans[,] advances[,] debts[,] overdraft indebtedness[,] credit card indebtedness[,] lease obligations[,] liabilities . . . and any present or future judgments against Borrower[,] future advances[,] loans[,] or transactions that renew[,] extend[,] modify[,] refinance[,] consolidate[,] or substitute these debts[,] liabilities[,] and obligations[.]"

Fourth, under the "Duration of Guaranty" provision, Gary's guaranty could become ineffective only upon written revocation, and revocation would not affect his liability for previous indebtedness:

"DURATION OF GUARANTY[.] This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender   or any notice to Guarantor or to Borrower  and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor[']s other obligations under this Guaranty shall have been performed in full[.] If Guarantor elects to revoke this Guaranty Guarantor may only do so in writing[.] Guarantor[']s written notice of revocation must be mailed to Lender by certified mail  at Lender[']s address listed above . . . [.] Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender . . . [.] [N]ew Indebtedness does not include all or part of the Indebtedness that is incurred by Borrower prior to revocation[,] incurred under a commitment that became binding before revocation[,] any renewals[,] extensions[,] substitutions[,] and modifications of the Indebtedness[.] This Guaranty shall bind Guarantor[']s estate as to the Indebtedness created both before and after Guarantor[']s death or incapacity regardless of Lender[']s actual notice of Guarantor[']s death[.]"

See 38 Am. Jur. 2d, Guaranty § 23; see also *Iola State Bank*, 233 Kan. at 454 ("[a]n offer for a continuing guaranty contract is ordinarily effective until revoked by the guarantor or extinguished by some rule of law").

Other provisions of the guaranty, however, favor Gary's contrary view. The Guaranty references a single promissory note, which suggests it was to apply to only that

loan and promissory note. At the top left corner of the guaranty, a handwritten note reflects number "9681" and "1-16-07[.]" And typed on the top left of each corner of each remaining page of the guaranty is "Loan No . . . 9681 C." This is the only loan number referenced in the guaranty.

Similarly, the guaranty limits Gary's debt to a specific dollar amount. The definition for "Guarantor[']s Share of Indebtedness" states that the extent of Gary's debt is more particularly described in the guaranty. The only description of the debt is a "Note," defined as "the promissory note dated January 16, 2007 in the original principal amount of $250,000.00 from Borrower to Lender together with all renewals of[,] extension of[,] modifications of[,] refinancing of[,] consolidations of[,] and substitutions for the promissory note or agreement." But the promissory note dated January 16, 2007, from Borrower to Lender was in the amount of $150,000, not $250,000. Still, the parties agree that Note 9681 in the amount of $150,000 is the same note referenced in the Weigel guaranty as being in the amount of $250,000. These limitations on the "[G]uarantor[']s share of the Indebtedness" seemingly restrict Gary's liability to $250,000.

But the primary guarantee of performance in the very first paragraph of Gary's guaranty states that "Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of Guarantor[']s Share of the Indebtedness of Borrower to Lender *and the performance and discharge of all Borrower[']s obligations under the Note and the Related Documents*." (Emphasis added.) Were it not for the latter clause, which we have italicized, Gary's liability would clearly be restricted, as his share of KMCC's indebtedness to CoreFirst is $250,000. But by also guaranteeing payment of "all [KMCC's] obligations under the Note and the Related Documents," Gary's liability is arguably unrestricted. This is because, as noted above, "related documents" is broadly defined to include, "all promissory notes[,] credit agreements[,] loan agreements[,] . . . and all other instruments[,] agreements[,] and documents[,] whether now or hereafter existing[,] executed in connection with the Indebtedness." And the $150,000 note was

12

only one of six notes signed on January 16, 2007, in connection with the indebtedness. And "Note" may be read as plural because the DEFINITIONS section of Gary's guaranty says so—"Words and terms used in the singular shall include the plural and the plural shall include the singular as the context may require." So the definition of "Note" as "the promissory note dated January 16, 2007," is, as the district court found, "a gateway to including lending under the other notes executed that day." And the district court correctly found that the Weigels' mortgage bears a handwritten reference to all six notes. When one considers the multiple notes signed that same date, along with the mortgage, ambiguity is apparent.

The language of the guaranty, viewed with its related documents, shows that the guaranty was ambiguous with regard to its scope. So despite the guaranty's unambiguous language that it was continuing, that same guaranty limits Gary's share of indebtedness to a single promissory note and to a specific dollar amount. The guaranty may be understood to reach two or more possible meanings. The district court did not err in finding the guaranty ambiguous.

*Did the District Court Err in Determining the Guaranty was Restricted?*

CoreFirst next contends that the district court erred in determining that the commercial guaranty was restricted to the sole loan it expressly referenced. It held Gary's guaranty applied solely to Note 9681 and his liability was not to exceed the amount of $250,000. We find the record supports that decision.

> "A contract of guaranty is to be construed, as are other contracts, according to the intention of the parties as determined by a reasonable interpretation of the language used in the light of the attendant circumstances. After the intention of the parties or the scope of the guarantor's undertaking has been determined by application of general rules of construction, the obligation is strictly construed and may not be extended by construction or implication. *Iola State Bank v. Biggs,* 233 Kan. 450, Syl. ¶¶ 1, 2, 662 P.2d 563 (1983);

13

*Trego WaKeeney State Bank v. Maier,* 214 Kan. 169, Syl. ¶¶ 2, 3, 519 P.2d 743 (1974)."
*Overland Park Savings & Loan Ass'n*, 243 Kan. at 738.

 See also 38 C.J.S., Guaranty § 40.

Besides the fact that Gary's guaranty references only promissory Note 9681, the attendant circumstances and the related documents support the district court's holding that the guaranty applied solely to Note 9681 and was not to exceed the amount of $250,000.

*Parol evidence supports the district court's finding*

Generally, the parol evidence rule provides that oral testimony of a prior agreement cannot be used to vary the terms of a written instrument. See *State v. Hood*, 255 Kan. 228, 236, 873 P.2d 1355 (1994).

> "[T]he parol evidence rule prevents a party to a written contract from attempting to vary its terms by relying on oral representations, be they characterized as negotiations or promises, made in discussions leading up to the agreement. A written contract, in most instances, subsumes earlier oral discussions or agreements. [Citation omitted.]" *Bouton v. Byers*, 50 Kan. App. 2d 35, 46, 321 P.3d 780 (2014).

But when a court finds the written contract language is ambiguous, parol evidence may be used to determine the intent of the parties. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, Syl. ¶ 3, 298 P.3d 250 (2013). And, "there is a wide distinction between an attempt to contradict the terms of a written instrument and to explain the circumstances and conditions under which it was executed and delivered." *In re Estate of Goff*, 191 Kan. 17, 29, 379 P.2d 225 (1963). "[T]he parol evidence rule is not violated when the evidence tends to show the relation of the parties and the circumstances under which the contract was executed." *Miles Excavating, Inc. v. Rutledge Backhoe & Septic Tank Services, Inc.*, 23 Kan. App. 2d 82, 84, 927 P.2d 517 (1996) (citing *Goff*, 191

14

Kan. at 29). Such is the case here. Because the intent of the parties was not clear in the guaranty, the district court properly considered parol evidence in making its decision.

We summarize the testimony here. KMCC builds and sells houses. KMCC sought to purchase 53 real estate lots—the Sutter Woods lots in Junction City. But those lots were unavailable until around six to eight months after KMCC wanted to purchase them and had received pre-approval from the bank to do so. Twelve lots known as the Deer Creek lots were more immediately available, but CoreFirst told Boling that KMCC would need additional collateral to secure them. Although Boling had sufficient collateral to get loans for the Sutter Woods lots, he needed other collateral for the Deer Creek lots.

So Boling contacted Gary about investing. The bank then drafted promissory Note 9681 for $150,000, which Boling understood would be used for "one spec house" in the Deer Creek area. Later, Note 9681 was renewed into loan 2327. Boling understood that Gary was assuming a debt only to secure the Deer Creek lots. Boling testified that he thought Gary was responsible for only Note 9681 and nothing else. Meyers testified, however, that he met with both Boling and Gary and explained that Gary would be held liable for all of KMCC's debts. Yet Boling contradicted that testimony and stated he would not have asked Gary to be responsible for all of KMCC's debts.

Likewise, Gary testified that he did not recall the meeting Meyers described, that he thought he had agreed to secure a note for up to $250,000, and that he would not have guaranteed any other note. He testified that he did not read the guaranty, despite having signed the guaranty's acknowledgement that he had read its terms. And Gary was not represented by counsel. He thought he was signing a contract that guaranteed payment for only one note and that is what was represented to him. But Gary acknowledged that his basic understanding of the deal was that his guaranty would ensure KMCC had enough collateral to obtain all 12 Deer Creek lots. And he did not know that the note referenced in his guaranty was to be used for a spec house.

15

Gary's misunderstanding of the purpose of his guaranty does not contradict the evidence that the parties intended the guaranty to apply only to Note 9681. The district court recognized this in its memorandum decision. In this regard, the district court also found that extending the intended purpose of the guaranty based on Gary's initial understanding would flout the strict construction of the guaranty as it was written with reference to a single note:

> "To extend the Weigel guaranty beyond the lending had on January 16, 2007, to other debt exclusively assigned to the Deer Creek Addition, would extend the guaranty by implication only based on Mr. Weigel's initial understanding of the purpose for seeking his guaranty was to purchase twelve lots in Deer Creek, a purpose or disbursement over which he had no power to control or some internal conduct of the Bank for which he, again, had no control."

Gary's testimony in relation to the date and the amount listed on Note 9681 supports the district court's finding that the parties intended the scope of the guaranty to be limited to Note 9681 only.

Only one note in the record—Note 9681—was signed on the date written at the top of the guaranty—January 16, 2007. But that note was not in the amount of $250,000—it was $150,000. Still, the $250,000 that Gary understood he would be liable for is the amount listed in his guaranty. Meyers testified that together with Note 9681, five other notes were signed on the same date. Those notes were not given to the Weigels' counsel before trial but their respective numbers were listed on the Weigels' mortgage. And although this could show that the parties intended for the mortgage to be tied to those other notes, the sum of the principal amounts of those notes far exceeds the specific amount of $250,000 listed in Gary's guaranty. And the principal amounts of the other promissory notes presented on appeal are $57,258.65, $114,513.65, $121,499.75, and $390,000. From this, it can at least be said that $150,000 is closest numerically to the $250,000 amount listed in the guaranty. And the guaranty references only Note 9681 and

16

specified that Gary's debt was limited to $250,000. Meyers agreed that Gary's guaranty was purposefully drafted to reference only one note—Note 9681. Yet Meyers testified that CoreFirst intended to require that Gary be held liable for all already pre-approved KMCC debts even though CoreFirst already had collateral and guaranties for those debts.

*Comparison of Bolings' guaranties to Gary's guaranty supports the district court's finding*

The district court compared Bolings' guaranties to Gary's guaranty and found them distinctively different. It concluded: "If the Bank truly intended the broadest construction for indebtedness to apply, it knew how to do so, but did not. This can be ascertained by a comparison with the relevant language used in the other individual guaranties obtained from each of Mr. and Mrs. Boling."

We agree that the differences between Bolings' guaranties and Gary's guaranty are substantial. Both of the Bolings' guaranties were signed on the same day as Gary's. The Bolings' guaranties, like Gary's, include a handwritten "9681" and "1-16-07" on the top left of the first page. They also include "Loan No . . . 9681 C" printed on the top of every subsequent page. And much of the stock language is the same.

But the first sentence of Gary's guaranty states that "Guarantor absolutely and unconditionally guarantees full and punctual *payment and satisfaction of Guarantor[']s Share of the Indebtedness* of Borrower to Lender and the performance and discharge of all Borrower[']s obligations under the Note and the Related Documents." (Emphasis added.) In contrast, the first sentence of the Bolings' guaranties states that "Guarantor absolutely and unconditionally guarantees full and punctual *payment and satisfaction of the Indebtedness of Borrower to Lender* and the performance and discharge of all Borrower[']s obligations under the Note and the Related Documents." (Emphasis added.) So the Bolings' primary promise to pay was quite different than Gary's.

Later, Gary's "CONTINUING GUARANTY" section states:

"THIS IS A CONTINUING GUARANTY UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT[,] PERFORMANCE[,] AND SATISFACTION OF THE GUARANTOR[']S SHARE OF INDEBTEDNESS OF BORROWER TO LENDER NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED ON A CONTINUING BASIS."

In contrast, the Bolings' guaranties "CONTINUING GUARANTY" provision states:

"THIS IS A CONTINUING GUARANTY UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT[,] PERFORMANCE[,] AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED ON A CONTINUING BASIS."

The broader scope of the Bolings' promise to pay is here repeated—the Bolings guaranteed payment of KMCC's indebtedness to CoreFirst, while Gary guaranteed payment of his share of KMCC's indebtedness to CoreFirst.

Gary's guaranty tells us what his share of KMCC's indebtedness to CoreFirst was. It twice defines the term "GUARANTOR[']S SHARE OF THE INDEBTEDNESS." First, as stated on page one:  "The words 'Guarantor[']s Share of the Indebtedness'  as used in this Guaranty mean an amount not to exceed Two Hundred Fifty Thousand & 00/100 Dollars ($250[,]000[.]00) of all the principal amount interest thereon to the extent not prohibited by law  and all collection costs[,] expenses[,] and attorney fees whether or not there is a lawsuit  and if there is a lawsuit  any fees and costs for trial and appeals[.]" Second, on page three, Gary's guaranty defines that same term to mean "[Guarantor's] indebtedness to Lender as more particularly described in this Guaranty." The more

18

particular description in the guaranty is the definition on page one, which limits Gary's guaranty to a maximum of $250,000. Thus, the amount of Gary's guaranty was restricted.

In contrast, the Bolings' guaranties do not use or define the term "Guarantor[']s Share of Indebtedness." The Boling guaranties underscore the difference by concluding the first paragraph with this expansive statement: "Under this Guaranty Guarantor[']s *liability is unlimited* and Guarantor[']s obligations are continuing[.]" (Emphasis added.) In contrast, Gary's guaranty concludes the first paragraph by omitting that italicized language: "Under this Guaranty Guarantor[']s obligations are continuing[.]" This, too, shows Gary's liability is not unlimited.

The Bolings' guaranties do not refer to a specific note or amount. Instead, they expansively state: "Note means and includes without limitation all of Borrower[']s promissory notes and/or credit agreements evidencing Borrower[']s loan obligations in favor of Lender." But Gary's guaranty defined "Note" restrictively as "the promissory note dated January 16[,] 2007 in the original amount of $250,000[.]00 from Borrower to Lender." The differences between the Bolings' guaranties and Gary's guaranty are stark and compel us to interpret them differently.

Because the guaranty was ambiguous, the district court properly considered parol evidence and found Gary's guaranty to be restricted. The district court properly found that Gary's guaranty can be applied only to the balance plus interest due under Note 9681, now 2327, limited to $250,000.

Affirmed.